## WILKES COUNTY *v.* COLER.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FOURTH CIRCUIT.

No. 247. Argued April 17, 20, 1903.—Decided May 18, 1903.

The North Carolina ordinance of March 8, 1868, has been declared by the Supreme Court of that State and by this court, (180 U. S. 532,) to have been the law of North Carolina when bonds were issued by Wilkes County for subscription to stock of the Northwestern North Carolina Railroad Company. All the conditions of the ordinance as to the route of the railroad and the approval of a majority of the qualified electors of the county having been met, the county had power to subscribe to the stock of the road and to issue its bonds therefor, and it cannot now contend that the bonds are invalid for want of power on its part to issue them.

THE case is stated in the opinion of the court.

*Mr. A. C. Avery* for petitioners.

*Mr. John F. Dillon* for respondents. *Mr. Harry Hubbard, Mr. John M. Dillon* and *Mr. Charles Price* were on the brief.

MR. JUSTICE HARLAN delivered the opinion of the court.

This is an action against Wilkes County, North Carolina,

upon certain bonds, each reciting that it was issued in payment of the subscription by that county to the capital stock of the Northwestern North Carolina Railroad Company, " by authority of an act of the General Assembly of North Carolina, ratified the 20th day of February A. D. 1879, entitled ' An act to amend the charter of the Northwestern North Carolina Railroad for the construction of a second division from the towns of Winston and Salem, in Forsyth County, up the Yadkin Valley, by Wilkesboro, to Patterson's factory, Caldwell County,' and authorized by a vote of a majority of the qualified voters of Wilkes County, by an election regularly held for that purpose on the 6th day of November A. D. 1888, and by an order of the Board of Commissioners of Wilkes County made on the first day of April A. D. 1889."

Coler & Co., holders of some of the bonds, obtained a judgment against the county in the Circuit Court. The case was then carried to the Circuit Court of Appeals, which certified certain questions to this court under the Judiciary Act of March 3, 1891, c. 517. Those questions were answered, and the answers having been certified to the court below, the case was finally tried, resulting in the affirmance of the judgment against the county. *Wilkes County* v. *Coler*, 180 U. S. 506; *Board of Commissioners* v. *Coler*, 113 Fed. Rep. 725. It is now here on writ of certiorari sued out by Wilkes County.

The facts out of which this litigation arose are fully set forth in the former opinion. It is necessary to restate some of them as well as to recall the points heretofore decided.

It appears that the principal question in the case, when formerly here, was as to the effect of the recitals in the bonds.

The plaintiffs contended that being *bona fide* holders they were entitled to assume that there had been a compliance with all the provisions of the act of February 20, 1879, upon the authority of which the bonds purported to have been issued.

The defendant contended that as the journals of the respective houses of the Legislature did not show that the yeas and nays were entered on the second and third readings of the bill subsequently published as the act of February 20, 1879, that act was void under section 14 of Article 2 of the state constitu-

tion, providing that "No law shall be passed . . . to impose any tax upon the people of the State, or to allow the counties, cities or towns to do so, unless the bill for the purpose shall have been read three several times in each house of the General Assembly, and passed three several readings, which readings shall have been on three different days, and agreed to by each house respectively, and unless the yeas and nays on the second and third reading of the bill shall have been entered on the journal."

This contention of the county was supported by several decisions of the Supreme Court of North Carolina that are referred to in our former opinion; and one of the questions propounded to this court was whether the Circuit Court should accept those decisions as controlling in respect of the alleged invalidity of the act of 1879. That question was answered in the affirmative, this court being of opinion that as matter of propriety and right the decision of the state court on the question as to what is a *law* of the State was binding upon the courts of the United States. 180 U. S. 506, 526.

That answer, of course, eliminated from the case the act of 1879 as giving authority to issue the bonds in suit; and it, therefore, became necessary to inquire whether such authority could be found elsewhere in the legislation of the State—this court being of opinion that the invalidity of the act of 1879, as conferring power to issue the bonds, did not estop holders of bonds from showing that there was in fact ample authority to issue them.

It was insisted that sufficient authority was to be found in the Ordinance of March 8, 1868, passed by the Convention that assembled at Raleigh, North Carolina, on January 14, 1868, for the purpose of framing a constitution for that State.

By that Ordinance, which took effect from its passage, it was provided: "That for the purpose of constructing a railroad of one or more tracks, from some point on the North Carolina Railroad, between the town of Greensboro, in Guilford County, and the town of Lexington, in Davidson County, running by way of Salem and Winston, in Forsyth County, to some point in the northwestern boundary line of the State, to

be hereafter determined, a company is hereby incorporated under the name and style of the Northwestern North Carolina Railroad Company, with a capital stock of two millions of dollars, which shall have a corporate existence as a body politic, for the space of ninety-nine years, . . . § 1. . . . That the capital stock of said company may be created by subscriptions on the part of individuals, corporations and counties, in shares of one hundred dollars. § 2. . . . That after the organization of said company and the election of the president and other necessary officers, the officers so elected shall proceed, under the advice of the directors, to locate the eastern terminus of the Northwestern North Carolina Railroad, and shall proceed to construct said road, with one or more tracks, as speedily as practicable, in sections of five miles each, to the towns of Winston and Salem in Forsyth County, which portion of said railroad, when completed, shall constitute its first division: *Provided*, That if the distance from the nearest section to the towns of Winston and Salem be less than five miles, the same shall be considered a section. § 5. . . . That the stockholders of said company may pay the stock subscribed by them either in money, labor or material for constructing said road, as the board of directors may determine, and that all counties or towns subscribing stock to said company shall do so in the same manner and under the same rules, regulations and restrictions as are set forth and prescribed in the act incorporating the North Carolina and Atlantic Railroad Company, [Atlantic and North Carolina Railroad Company,] for the government of such towns and counties as are now allowed to subscribe to the capital stock of said company. § 12. . . . That the company shall have power to construct branches of said road, one of which shall run from the towns of Winston and Salem by way of Mount Airy, in Surry County, to the line of the State of Virginia." § 13.

The act incorporating the Atlantic and North Carolina Railroad Company, referred to in the Ordinance of 1868, was passed in 1852. Laws of N. C. 1852, pp. 484, 499. By section 33 of that act it was made "lawful for any incorporated town or county near or through which said railroad may pass to

subscribe for such an amount of stock in said company as they shall be authorized to do by the inhabitants of said town or the citizens of such county, in manner and form as hereinafter provided." By section 35 it was provided "that if upon the return of such constable . . . it shall appear that a majority of the qualified voters of such town and by the return of the sheriff that a majority of the qualified voters of such county voting upon the question are in favor of the subscription, the corporate authorities of such town, and the justices of such county shall appoint an agent to make the subscription in behalf of such town and county, to be paid for in the bonds of such town and county and on such time as shall be agreed on by said town officers and the justices of such county." Laws of N. C. 1852, c. 136.

After referring to certain decisions of the Supreme Court of North Carolina, relating to the Ordinance of 1868—particularly *Hill* v. *Com'rs*, 67 N. C. 367, and *Belo* v. *Com'rs*, 76 N. C. 489 —we said: "It results that when the bonds here in question were issued in 1889, it was the law of North Carolina that the Ordinance of 1868, constituting the charter of the North Western North Carolina Railroad Company, was not superseded by the constitution of 1868, but was in force and therefore gave power to counties *embraced by its provisions* to take stock in that company and pay for it in county bonds just as Forsyth County had done." 180 U. S. 529.

Another principle announced in our former opinion was that the rights of the parties were to be determined by the law of the State as it was declared by the state court to be at the time the bonds were issued in the name of the county and put upon the market.

As indicating some of the points left undecided, we make this extract from our opinion :

"We have referred fully to the *Hill* and *Belo* cases because of the earnest contention of learned counsel that under the law of North Carolina, as declared in those cases before the bonds in question were made, the Ordinance of 1868, without the aid of subsequent legislation, gave full power to Wilkes County to issue such bonds. This view suggests various questions as to the

scope and effect of that Ordinance. Assuming, as we must, that the *Belo* and *Hill* cases held that the Ordinance of 1868 remained in force after the adoption of the constitution, did the general power given by that Ordinance to the North Western Railroad Company to construct a railroad from its eastern terminus, 'running by way of Salem and Winston, in Forsyth County, to *some* point in the northwestern boundary line of the State, *to be hereafter determined,*' invest Wilkes County with authority to subscribe to the stock of the company and to issue bonds in payment of such subscription? Was Wilkes County in the same category with Forsyth County? Was the route of the road northwest of Salem and Winston to some point in the northwestern boundary line of the State to be determined by the legislature or by the company? If by the legislature, was that route ever determined otherwise than by the act of 1879, which has been adjudged never to have become a law of the State? Did Wilkes County have authority, under the Ordinance of 1868 alone, to aid, by a subscription of stock and bonds, the construction of the second division of the road referred to in the act of 1879, extending from the towns of Winston and Salem, up the valley of the Yadkin by way of Jonesville and Wilkesboro, in the county of Wilkes, to Patterson's Factory, in the county of Caldwell? These are matters about which we do not feel disposed to express an opinion under the very general and indefinite questions certified from the Circuit Court of Appeals. Nor do we deem it proper to express any opinion as to the scope and the effect upon the rights of the parties of sections 1996, 1997, 1998 and 1999 of the Code of North Carolina. The certified questions do not directly or explicitly relate to any question arising under those sections of the Code; and it is not appropriate that this court should, under the questions certified, consider and determine the entire merits of the case." 180 U. S. 532.

That the qualified voters of Wilkes County gave their sanction to a subscription to the capital stock of the Northwestern North Carolina Railroad Company; that the bonds in suit are part of those issued in payment of such subscription; that stock was issued to the county to the full amount subscribed; that

the road desired by the people of the county was constructed and is in operation ; that for many years the county paid interest upon the bonds ; and that the plaintiff purchased the bonds in suit for value and in good faith ; these propositions are not disputed. However strongly these facts appeal to every one's sense of right and justice, they do not estop the county from raising the question of its power to have made the subscription and issued the bonds in question. We repeat what was said in the former opinion—indeed what had been held in many previous decisions—that if there was an absolute want of power to issue the bonds in question every purchaser of them was charged, in law, with notice of that fact, and could not look to the county in whose name they were issued. Such power could not be created by mere recitals in the bonds.

Did the county of Wilkes have power to issue these bonds ? The plaintiff insists that the county had double legislative authority for issuing them ; first, under the ordinance of 1868 incorporating the Northwestern North Carolina Railroad Company ; second, under the above sections of the Code of North Carolina of 1883.

We have seen that at the time the bonds were issued the Ordinance of 1868 was in force and gave power to counties embraced by its provisions to take stock in the Northwestern North Carolina Railroad Company and pay for it in county bonds. This was held, in our former opinion, to be taken as the law of North Carolina, because so declared by the Supreme Court of that State when the bonds were issued, and therefore as the law by which the rights of the parties were to be determined. So that the vital inquiry, on this part of the case, is whether the road in question was embraced by the provisions of the Ordinance of 1868, and therefore one that could be aided under that Ordinance by county subscriptions and bonds. If so, Wilkes County was plainly in the same category as Forsyth County, and its bonds (issued in payment of the subscription made by it) must be sustained as valid upon the same grounds as the Supreme Court of North Carolina approved in reference to the bonds issued by Forsyth County.

Turning now to the Ordinance of 1868, we find that the North-

-western North Carolina Railroad Company was incorporated to construct a railroad of one or more tracks "from some point on the North Carolina Railroad between the towns of Greensboro and Lexington, running by way of Salem and Winston in Forsyth County to some point in the northwestern boundary line of the State, to be hereafter determined." No question arises in the present case as to the route adopted for the road that was constructed from its beginning point or eastern terminus to Salem and Winston, two towns near each other. It was mandatory under the ordinance that the road should run by the way of Salem and Winston. The road that Wilkes County desired to be built was from Salem and Winston to Wilkesboro. That was the road in aid of the construction of which its bonds were issued. If a road from Salem and Winston to Wilkesboro was substantially in the direction of "the northwestern boundary line of the State," then it would be one authorized by the Ordinance of 1868. The Ordinance did not fix the particular point in the northwestern boundary at which the northwestern terminus of the road should be established: It was some point, on that boundary, to be thereafter determined. Unless the legislature interfered and itself fixed the northwestern terminus of the road, the railroad company had the power to establish it at its convenience or as the necessities of the situation required, taking care that whatever route was adopted the road as constructed from time to time was to be, substantially, in the direction of some point in what was reasonably to be deemed the northwestern boundary line of the State. Undoubtedly those interested in the enterprise, as well as the Convention, contemplated that the road would be built mainly by money derived from municipal subscriptions and bonds.. The railroad company was, therefore, left free to adopt a general route that would take the road "near or through" such counties as would aid the enterprise—no condition as to route being imposed except that the road should be in the direction of some point on the northwestern boundary line of the State. The authority of counties, by subscription of stock and bonds, to aid in the construction of a part of the road, did not depend upon the northwestern terminus being first established. If a county

had authority, under any circumstances, to subscribe stock and issue bonds that authority could be exercised with reference to that part of the road in which, by reason of its location, it was immediately concerned. We are of opinion that the part of the Northwestern North Carolina Railroad which is here in question was, in a substantial sense, in the direction of some point in the northwestern boundary line of the State—due regard being had to the physical nature of the country through which it was to pass. The contention to the contrary cannot be sustained.

Looking further into the Ordinance of 1868, we find that it contemplated and authorized subscriptions by counties. It provided that all counties and towns subscribing stock to said company should do so in the same manner and under the same rules, regulations and restrictions as were set forth and prescribed in the charter of the Atlantic and North Carolina Railroad Company for the government of such towns and cities as were then allowed to subscribe to the capital stock of that company. Reading those provisions of the charter of the Atlantic and North Carolina Railroad Company into the Ordinance of 1868, it is, we think, clear that any county near or through which the Northwestern North Carolina Railroad might pass (in the direction of some point in the northwestern boundary line of the State) could subscribe stock to be paid for by its bonds, provided, always, that the subscription was first approved by a majority of the qualified electors of the county voting upon the question of subscription. All these conditions were met in the case of Wilkes County. The qualified voters sustained the proposition to subscribe, and there is no substantial ground upon which to rest the contention that the county was without power, under the Ordinance of 1868, to make the subscription in question and to issue its bonds in payment therefor.

Other questions relating to the Ordinance of 1868 were discussed by counsel; but in the view we take as to its scope and meaning those questions need not be noticed in this opinion.

The appellees further insist that ample authority to issue the bonds in suit is also found in sections 1996, 1997, 1998, 1999 and 2000 of the Civil Code of North Carolina.

We do not deem it necessary to determine the scope of those sections; for, as we have seen, Wilkes County, independently of those sections, had authority under the Ordinance of 1868 to make the subscription and issue the bonds here in question. And this conclusion rests upon the law of North Carolina as declared by the Supreme Court of the State to have been at the time Wilkes County made its subscription and issued its bonds. This is sufficient to dispose of the case.

The judgment is

*Affirmed.*